**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SUBPOENA ISSUED IN:<br><br>*St. Clair County Employees' Retirement System v. Acadia Healthcare Company, Inc. et al.*, pending in the United States District for the Middle District of Tennessee, Case No. 3:18-cv-00988-WLC-AEN | Misc. No. <u>1:22-mc-144</u><br><br>**ORAL ARGUMENT REQUESTED** |
| DAVID FABER<br><br>                       Petitioner,<br><br>     v.<br><br>CHICAGO VICINITY LABORERS DISTRICT COUNCIL PENSION FUND and NEW YORK HOTEL TRADES COUNCIL & HOTEL ASSOCIATION OF NEW YORK CITY, INC. PENSION FUND,<br><br>                  Respondents. | |

**MEMORANDUM OF LAW OF PETITIONER DAVID FABER IN SUPPORT OF**
**MOTION TO QUASH NON-PARTY SUBPOENA**

Elizabeth A. McNamara
Meenakshi Krishnan (*pro hac vice* forthcoming)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 603-6437
lizmcnamara@dwt.com
meenakshikrishnan@dwt.com

Daniel M. Kummer
Senior Vice President, Litigation
NBCUNIVERSAL MEDIA, LLC
30 Rockefeller Plaza, Rm. 620-537
New York, New York 10112
Telephone: (212) 664-4017
daniel.kummer@nbcuni.com

*Attorneys for Petitioner David Faber*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................. 3

    A.    Non-Party David Faber's November 2018 Statements............................ 3

    B.    The Underlying Litigation ....................................................................... 4

    C.    The Subpoena.......................................................................................... 7

ARGUMENT ......................................................................................................... 8

    I.    THIS COURT SHOULD QUASH THE SUBPOENA BECAUSE THE
        TESTIMONY SOUGHT IS PROTECTED FROM DISCLOSURE BY
        THE REPORTER'S PRIVILEGE. ........................................................ 8

        A.    The Pension Funds Cannot Satisfy the High Burden of
            Overcoming the Reporter's Privilege for Confidential
            Newsgathering Materials. ........................................................... 9

            1.    The Pension Funds Cannot Make a Clear and Specific
                Showing that Mr. Faber's Testimony Is Highly Material or
                Relevant. ...................................................................... 10

            2.    The Testimony Sought Is Not Necessary or Critical to the
                Maintenance of the Pension Funds' Claims Against Acadia,
                Either at Class Certification or Summary Judgment.................... 12

            3.    The Information Sought is Obtainable from Other Sources. ........ 17

        B.    To the Extent the Subpoena Calls for Testimony about Non-
            Confidential Newsgathering Materials, the Pension Funds Still
            Cannot Satisfy their Burden of Overcoming the Reporter's
            Privilege. ................................................................................... 19

            1.    The Testimony Sought is Not of Likely Relevance to a
                Significant Issue in the Case. ........................................................ 20

            2.    The Pension Funds Cannot Establish that the Information
                Sought is Not Reasonably Obtainable from Other Available
                Sources. ........................................................................ 21

CONCLUSION...................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. F&F Inv.*,
   470 F.2d 778 (2d Cir. 1972)...................................................................................9, 12, 14

*Breaking Media, Inc. v. Jowers*,
   No. 1:21-mc-00194, 2021 WL 1299108 (S.D.N.Y. Apr. 7, 2021) ...........................................8

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)...................................................................................................15

*Giuffre v. Maxwell*,
   221 F. Supp. 3d 472 (S.D.N.Y. 2016).................................................................. *passim*

*Gonzales v. Nat'l Broad. Co.*,
   194 F.3d 29 (2d Cir. 1999).................................................................................9, 20, 21

*Holmes v. Winter*,
   22 N.Y.3d 300 (2013) ...............................................................................................9, 10

*In re Appl. to Quash Subpoena to Nat'l Broad. Co.* (*Graco*),
   79 F.3d 346 (2d Cir. 1996).........................................................................................17, 18

*In re Behar*,
   779 F. Supp. 273 (S.D.N.Y. 1991) .....................................................................13, 17, 18

*In re Consumers Union of U.S., Inc.*,
   495 F. Supp. 582 (S.D.N.Y. 1980) ............................................................................19

*In re Forbes Mag.*,
   494 F. Supp. 780 (S.D.N.Y. 1980) ............................................................................18

*In re McCray, Richardson, Santana, Wise, Salaam Litig.*,
   991 F. Supp. 2d 464 (S.D.N.Y. 2013).......................................................................20, 21

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) .....................................................................................16

*In re Petroleum Prod. Antitrust Litig.*,
   680 F.2d 5 (2d Cir. 1982) (per curiam)............................................................... *passim*

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016).......................................................................................15

*Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund*
   *v. Omnicare, Inc.*,
   583 F.3d 935 (6th Cir. 2009) .....................................................................................16

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)...................................................................16

*Lebowitz v. City of N.Y.*,
    948 F. Supp. 2d 392 (S.D.N.Y. 2013)...................................................................21

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...................................................................................15

*Lonegan v. Hasty*,
    No. CV-04-2743 (NG)(VVP), 2008 WL 41445 (E.D.N.Y. Jan. 1, 2008) ................9

*New England Teamsters & Trucking Indus. Pension Fund v. New York Times Co.*,
    No. 1:14-mc-59, 2014 WL 1567297 (S.D.N.Y. Apr. 17, 2014) ........................21, 22

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    830 F.3d 376 (6th Cir. 2016) ..................................................................................15

*Persky v. Yeshiva Univ.*,
    No. 1:01-cv-5278, 2002 WL 31769704 (S.D.N.Y. Dec. 10, 2002) ............10, 12, 18

*Pugh v. Avis Rent A Car Sys., Inc.*,
    No. M8-85, 1997 WL 669876 (S.D.N.Y. Oct. 28, 1997) .......................................11

*Ret. Sys. v. Acadia Healthcare Co. et al.*,
    ECF 140-1 (M.D. Tenn.)............................................................................................7

*Schell v. Amendia, Inc.*,
    No. 21-mc-00090-PAB-STV, 2021 WL 1541712 (D. Colo. Apr. 20, 2021) ...........1

*Schoolcraft v. City of N.Y.*,
    No. 1:10-cv-6005, 2014 WL 1621480 (S.D.N.Y. Apr. 22, 2014) ...............13, 20, 22

*Sikelianos v. City of N.Y.*,
    No. 05-civ-7673, 2008 WL 2465120 (S.D.N.Y. June 18, 2008)........................20, 21

*Sommer v. PMEC Assocs. & Co.*,
    No. 88 CIV. 2537 (JFK), 1991 WL 73858 (S.D.N.Y. May 1, 1991) .....................17

*St. Clair Cty. Emps. Ret. Sys. v. Acadia Healthcare Co. et al.*,
    No. 3:18-cv-00988 (M.D. Tenn.)..................................................................1, 7, 15, 16

*United Sates v. Treacy*,
    639 F.3d 32 (2d Cir. 2011)......................................................................................22

*United States ex rel. Vuitton Et Fils, S.A. v. Karen Bags, Inc.*,
    600 F. Supp. 667 (S.D.N.Y. 1985) ........................................................................11

*United States v. Marcos*,
    No. 87 CR 598, 1990 WL 74521 (S.D.N.Y. June 1, 1990) ........................................13, 17, 22

*United States v. Shah*,
    No. 1:19-cr-833 (SHS), 2022 WL 1422252 (S.D.N.Y. May 5, 2022)..............................20, 21

*von Bulow by Auersperg v. von Bulow*,
    811 F.2d 136 (2d Cir. 1987)........................................................................................8

**Statutes**
Securities Exchange Act of 1934 ............................................................................4, 5, 8

**Rules**
Federal Rule of Civil Procedure 45(d)(3) ...................................................................1, 8

Federal Rule of Civil Procedure 23(b)(3) ...................................................................5

**Constitutional Provisions**
First Amendment .................................................................................................9, 19, 22

Pursuant to Federal Rule of Civil Procedure 45(d)(3), Petitioner David Faber ("Petitioner" or "Mr. Faber"), by and through undersigned counsel, respectfully submits this memorandum of law in support of his Motion to Quash the Non-Party Subpoena commanding testimony in a remote deposition ("Subpoena"). Mr. Faber is a journalist who appears daily on the CNBC business news cable network. The Subpoena was issued by Respondents Chicago Vicinity Laborers District Council Pension Fund and New York Hotel Trades Council & Hotel Association of New York City, Inc. Pension Fund ("Pension Funds"), the lead plaintiffs in the underlying case *St. Clair County Employees' Retirement System v. Acadia Healthcare Co. et al.*, No. 3:18-cv-00988-WLC-AEN, pending in the United States District Court for the Middle District of Tennessee (the "Action"). The Subpoena was served on Mr. Faber in New York, New York, where he resides.[1] The Subpoena lists his home address, and specifies that "[t]he deposition will proceed remotely with the witness & counsel to appear via remote video access." Accordingly, this District is the proper venue for this Motion.[2]

## INTRODUCTION

In October 2018, the underlying class action lawsuit was filed in the Middle District of Tennessee against Acadia Healthcare and its executives ("Acadia"), alleging that Acadia engaged in an elaborate, years-long scheme to deceive and defraud its investors, causing significant financial losses when those misrepresentations came to light.[3] In November 2018, CNBC

---

[1] Counsel for Mr. Faber's employer, NBCUniversal Media, LLC, accepted service of the Subpoena on his behalf in New York, New York. Declaration of Elizabeth A. McNamara ("McNamara Decl.") ¶ 2.

[2] Motions to quash a third-party subpoena must be brought in "the court for the district *where compliance is required.*" Fed. R. Civ. P. 45(d)(3) (emphasis added). Because the Subpoena commands testimony in a remote deposition, and because Mr. Faber resides in New York City, the place of compliance is this District. Therefore, this Court is the proper venue for this Motion. *See Schell v. Amendia, Inc.*, No. 21-mc-00090-PAB-STV, 2021 WL 1541712, at *2-3 (D. Colo. Apr. 20, 2021) (establishing that nonparty deponent's state of residence and employment was the place of compliance for remote deposition).

[3] The lawsuit was first filed on October 1, 2018 by individual plaintiff St. Clair County Employees' Retirement System, but the Pension Funds filed the operative consolidated class-action complaint on April 1, 2019. *St. Clair Cty. Emps. Ret. Sys. v. Acadia Healthcare Co. et al.*, No. 3:18-cv-00988, ECF Nos. 1 & 39 (M.D. Tenn.).

journalist David Faber reported – in brief on-air remarks – that a potential leveraged buyout of Acadia appeared to be stalled.  Now, several years later, Mr. Faber does not recall the source(s) for that reporting, although he has no doubt, based on his general journalistic practices, the nature of the information, and what he said in his report, that they were confidential sources.

The Pension Funds' subsequently-filed 100-page consolidated complaint does not once mention Mr. Faber or his reporting.   Instead, several years and many briefs into the litigation, the Pension Funds now seek to validate a hunch that Acadia itself was the source for Mr. Faber's reporting, which, even if proven, would do nothing more than compound the mountains of evidence of fraudulent behavior they have already alleged against Acadia.  As explained more fully below, such testimony – even if it could be obtained – is in no way relevant to the objective legal elements at issue in the underlying case, either for the already-briefed issue of class certification or any possible future summary judgment motion.  Put simply, the Pension Funds seek from a non-party journalist the identity of confidential source(s) that he does not recollect, as part of litigation to which he is a complete stranger, for purposes that are, at best, cumulative and tangential to the lawsuit's central claims.

Mr. Faber is fully protected by the reporter's privilege under federal law.  The reporter's privilege is intended for exactly this situation: to shield journalists from unwarranted fishing expeditions regarding their newsgathering sources and entanglements in litigation solely by virtue of the subjects they cover.  The Pension Funds' claims against Acadia continue to proceed apace in the Middle District of Tennessee.  In the meantime, the Pension Funds cannot force Mr. Faber to testify about his reporting and sources based solely on a hunch about who his source(s) might be, or on the off chance that they may unearth something helpful for their legal claims.  *Giuffre v. Maxwell*, 221 F. Supp. 3d 472, 480 (S.D.N.Y. 2016).  The Pension Funds cannot satisfy their

stringent burden to overcome the reporter's privilege for either confidential or non-confidential news information. Mr. Faber therefore respectfully requests that the Court quash the Subpoena.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Non-Party David Faber's November 2018 Statements

Mr. Faber is an award-winning professional journalist employed by CNBC, a cable business news network owned by NBCUniversal Media, LLC ("NBCUniversal"). Declaration of David Faber ("Faber Decl.") ¶¶ 1-2. Mr. Faber currently co-anchors CNBC's program "Squawk on the Street," hosts the channel's "The Faber Report," and serves as an anchor and co-producer for CNBC's long-form reporting and original documentaries. *Id.* ¶ 2. He has worked as a business journalist for more than thirty years, breaking prominent news stories including Disney's deal to buy most of Twenty-First Century Fox's assets, the massive fraud at WorldCom, and Rupert Murdoch's unsolicited bid for Dow Jones. *Id.* Given that Mr. Faber's bread-and-butter reporting involves highly sensitive commercial and financial information relating to Wall Street trading, business developments, and markets, he regularly conducts interviews with sources on a confidential basis in the normal, daily course of his journalism. *Id.* ¶ 3. As he explains in his accompanying Declaration, his ability to honor such promises of anonymity is fundamental to his work as a reporter. *Id.*

On November 16, 2018, while co-anchoring that day's "Squawk on the Street" program (the "CNBC Segment"), Mr. Faber briefly reported for approximately one minute on recent developments regarding the stalled leveraged buyout deal involving Acadia. *Id.* ¶ 4 & Ex. A at 16:22-17:16. Mr. Faber stated, "I don't know . . . if you saw the bear raid on this stock a few days ago . . . ACHC [Acadia], yeah, there was some nasty stuff going around on, on Acadia[.]" *Id.* Mr. Faber added that "the process itself seems to have been stalled in terms of a potential LBO [leveraged buyout] on this company." *Id.* Although "KKR had been the leading bidder, was trying

3

to get a co-investor," Mr. Faber reported that "I've now heard from people close to the situation that [the leveraged buyout's] been stalled, not looking particularly promising at this point, if you will." *Id.* (collectively, the "Statements").

Because the CNBC Segment aired nearly four years ago, Mr. Faber no longer recalls who his source(s) were for the Statements, nor does he have any documents in his possession indicating his source(s). *Id.* ¶ 5.  However, having reviewed the CNBC Segment, and based on his regular practices, the language he uses in the Segment, and because the Statements involve highly sensitive information regarding Acadia's business dealings, Mr. Faber has no doubt that his source(s) were confidential. *Id.* ¶ 6.

### B.    The Underlying Litigation

The underlying lawsuit was filed on October 1, 2018 by individual plaintiff St. Clair County Employees' Retirement System.  On April 1, 2019, the Pension Funds, as lead plaintiffs, filed a consolidated class action complaint ("Complaint") in the Middle District of Tennessee against defendants Acadia and several of its executives, alleging several claims under the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission Rule 10 b-5, 17 C.F.R. §240.10b-5.  McNamara Decl. Ex. B.  The Pension Funds allege that Acadia "engag[ed] in a scheme to mislead the public" regarding the "(i) the quality of care and the adequacy of staffing at Acadia's facilities; (ii) Acadia's substantial compliance with all applicable laws and regulations; and (iii) Acadia's operations, earnings guidance and expected revenue growth in its U.K. facilities."  McNamara Decl. Ex. I at 3.  The Pension Funds further allege that Acadia's alleged "fraud" came to light through a "series of partial disclosures" followed by steep stock price declines: an October 24, 2017 Acadia release on its financial results; an October 11, 2018 third-party report purportedly documenting patient abuse and neglect at Acadia facilities; and relevant to this motion, a November 16, 2018 article published by *Seeking Alpha*

entitled, "Acadia Healthcare: Very Scary Findings from a 14-Month Investigation." *Id.* at 4-5; McNamara Decl. Ex. B ¶¶ 8-12. The Pension Funds claim that because of these partial disclosures, they and other class members who purchased Acadia stock at "artificially inflated prices suffered significant damages as the truth about, and impact associated with, [Acadia's] misstatements and scheme to defraud was revealed to the market" and seek to recover their resultant losses. McNamara Decl. Ex. I at 5. Finally, the Pension Funds claim that Acadia engaged in massive insider sales and trading prior to the corrective disclosures to "accumulate . . . ill-gotten gains." McNamara Decl. Ex. B ¶ 195. Although filed six months after the CNBC Segment aired, the 100-page Complaint *does not once mention* Mr. Faber, the CNBC Segment, or the Statements.

On May 31, 2019, Acadia moved to dismiss the amended complaint, which was denied on January 20, 2021. McNamara Decl. Exs. C-F. Acadia filed its answer and defenses to the Complaint on February 19, 2021. McNamara Decl. Ex. G. As with the Complaint, neither the parties' lengthy motion-to-dismiss briefing, nor the court's order denying the motion, nor Acadia's answer and defenses referenced Mr. Faber, the CNBC Segment, or the Statements. Discovery has commenced and continues in the Action. McNamara Decl. Ex. H.

On February 1, 2022, the Pension Funds filed an updated motion for class certification, which similarly makes no reference to Mr. Faber, the CNBC Segment, or the Statements. McNamara Decl. Ex. I. Instead, the Pension Funds argue that the proposed class satisfies the requirements of Fed. R. Civ. P. 23(b)(3) in part because they satisfy the requirement that "at least one [common] factual or legal question" predominates over individual questions. *Id.* at 12. Specifically, the Pension Funds argue under two theories that predominance is established with respect to "reliance," one of the legal elements of their Section 10(b) Securities Exchange Act claim. *Id.* at 13. Neither theory in any way involves Mr. Faber or the Statements.

On March 1, 2022, Acadia filed its opposition to the Pension' Funds class certification motion.  McNamara Decl. Ex. J.  Acadia argues that with respect to *one* of the three events alleged by the Pension Funds to have impacted the price of Acadia's securities – the November 16, 2018 publication of the so-called "*Seeking Alpha*" article – the subsequent stock price decline was attributable not to that article, but rather to Mr. Faber's Statements that same day.  *Id.* at 16.  Acadia relies primarily on its expert's extensive "analysis of intraday trading prices," which concludes that the Statements "report[ing] negative news about Acadia's sale processes" led to an immediate decline in Acadia's stock price.  *Id.* at 16-17; *see also* McNamara Decl. Ex. K at 19-25.[4]  In several years of litigation, this was the first time *any* filing mentioned the Statements.  However, even this reference in no way implicates the details of Mr. Faber's *newsgathering*; rather, Acadia claims the *airing* of the Statements objectively caused a price decline in Acadia's securities.

On reply, the Pension Funds argue that Acadia fails to establish that *only* the Statements moved the stock price by criticizing Acadia's expert report and deposition testimony on various grounds.  McNamara Decl. Ex. L at 10-11.  Importantly, relying on their own price impact rebuttal expert, the Pension Funds further argue that *even if* the November 16, 2018 stock price decline was solely attributable to the Statements, Acadia still could not prove a complete "lack of price impact for the alleged misstatements concerning quality of care, staffing, and regulatory compliance, because those misstatements and the failed private equity buyout are linked."  *Id.* at 11; *see also* McNamara Decl. Ex. M at 13-15.  Much of this argument was filed under seal on the public docket.  McNamara Decl. Ex. L at 12-13.

---

[4] Acadia also secondarily relies on four other pieces of evidence for that argument:  (1) the *Seeking Alpha* article author's purported concession that the stock price moved because of the Statements; (2) an investment advisor's contemporaneous attribution of the decline to a "press report" stating that sale talks had stalled; (3) analyst reports issued at the time supposedly consistent with a lack of price impact; and (4) the alleged "generic nature" of the misstatements.  McNamara Decl. Ex. J at 17-18.

The class certification motion is now fully briefed, pending before the Middle District of Tennessee.[5]

### C.    The Subpoena

On April 21, 2022, NBCUniversal accepted service of the Subpoena on behalf of Mr. Faber.  McNamara Decl. Ex. A.[6]  The Subpoena commanded Mr. Faber to appear at a remote deposition on May 11, 2022, at 9:00 a.m., but did not include a list of topics of the testimony sought.

On April 26, 2022, NBCUniversal's in-house counsel discussed the Subpoena with counsel for the Pension Funds.  McNamara Decl. ¶ 4.  The Pension Funds' counsel informed NBCUniversal's counsel that they sought to determine whether Mr. Faber's Statements concerning Acadia were based on information received from Acadia or one of its agents or employees to rebut Acadia's opposition to the Pension Funds' class certification motion.  *Id.*

On May 5, 2022, the undersigned counsel conferred with counsel for the Pension Funds. McNamara Decl. ¶ 5.  The Pension Funds' counsel again stated that they sought Mr. Faber's sourcing for the Statements but did not describe any other information sought from Mr. Faber.  *Id.* While acknowledging that the class certification motion is fully briefed and pending before the Middle District of Tennessee, the Pension Funds' counsel stated that they also sought the identity of the source(s) for use at the summary judgment stage.  *Id.*  Counsel further stated that they had attempted to seek the information from other sources, including Acadia and a private equity entity,

---

[5] On April 22, 2022, Acadia filed a motion for leave to file a sur-reply and attached a sur-reply, making the same arguments regarding the trigger for the November 16, 2018 stock price decline.  *St. Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co. et al.*, ECF No. 140-1 (M.D. Tenn.).  On May 6, 2022, the Pension Funds filed an opposition to Acadia's motion, or for leave to file response to Acadia's sur-reply, to which Acadia filed a reply on May 13, 2022. *Id.*, ECF Nos. 146, 147-1, 148.  As of this filing, the Middle District of Tennessee has not ruled on these motions.

[6] Mr. Faber previously received a subpoena issued by the Pension Funds for documents related to the CNBC Segment. McNamara Decl. ¶ 3.  On August 31, 2021, Mr. Faber through counsel informed the Pension Funds that there "are no documents in David Faber's possession, custody, or control responsive to either of the two document requests in the [s]ubpoena[.]"  *Id.*

but failed. The parties agreed that Mr. Faber's deposition date would be continued pending resolution of this Motion to Quash. *Id.*

**ARGUMENT**

Federal Rule of Civil Procedure 45(d)(3) provides that, "[o]n timely motion, the court for the district where compliance is required must quash or modify a subpoena that: . . . requires *disclosure of privileged or other protected matter*, if no exception or waiver applies[.]" (emphasis added). The Subpoena should be quashed under Rule 45 because the testimony the Subpoena seeks constitutes confidential newsgathering information that is protected from disclosure by the qualified reporter's privilege established under the law of this Circuit.

**I.     THIS COURT SHOULD QUASH THE SUBPOENA BECAUSE THE TESTIMONY SOUGHT IS PROTECTED FROM DISCLOSURE BY THE REPORTER'S PRIVILEGE.**

Under the Second Circuit's applicable precedents, the reporter's privilege protects reporters from the compelled disclosure of confidential newsgathering materials and information – precisely what the Pension Funds seek from Mr. Faber's testimony – as well as non-confidential, unpublished newsgathering materials and information. The federal reporter's privilege applies here because the claims in the underlying litigation are governed by federal statute – the Securities Exchange Act. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) ("federal law of [reporter's] privilege controls" in a federal question case); *cf. Breaking Media, Inc. v. Jowers*, No. 1:21-mc-00194, 2021 WL 1299108, at *4 (S.D.N.Y. Apr. 7, 2021). However, "[i]n examining the boundaries of the journalist's privilege" under federal law, the Second Circuit has instructed courts to "consider also the applicable state law, in this case New York's so-called 'Shield Law,'" and advised that courts should not "ignore New York's policy of giving protection to professional journalists." *Id.* at 144. As the New York Court of Appeals has observed, "New York public policy as embodied in the Constitution and our current statutory scheme provides a

8

mantle of protection for those who gather and report the news—*and their confidential sources*— that has been recognized as *the strongest in the nation.*"  *Holmes v. Winter*, 22 N.Y.3d 300, 310 (2013) (emphases added).

The Second Circuit "has long recognized the existence of a qualified privilege for journalistic information" under federal common law.  *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 32 (2d Cir. 1999).  This privilege reflects the "'paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment.'"  *Baker v. F&F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972).  The Second Circuit has set forth a two-tiered test for overcoming the federal reporter's privilege – one applying to confidential information and the other to non-confidential information. *Gonzales,* 194 F.3d at 32.  The Pension Funds cannot satisfy either test.  Accordingly, this Court should quash the Subpoena.

### A.  The Pension Funds Cannot Satisfy the High Burden of Overcoming the Reporter's Privilege for Confidential Newsgathering Materials.

Because this Circuit has long recognized that confidentiality is "essential to fulfillment of the pivotal function of reporters to collect information for public dissemination," *In re Petroleum Prod. Antitrust Litig.*, 680 F.2d 5, 8 (2d Cir. 1982) (per curiam), it has established a demanding qualified privilege that protects reporters from being compelled to reveal their confidential sources and information.  *See Baker*, 470 F.2d at 782 ("Compelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis."); *Lonegan v. Hasty*, No. CV-04-2743 (NG)(VVP), 2008 WL 41445, at *2 (E.D.N.Y. Jan. 1, 2008) ("The damage caused by the required revelation of confidential information is obvious: if sources fear that their identities will be readily subject to exposure, they

will be less likely to provide information to journalists and the press's ability to perform its constitutionally protected function will be compromised.").

In reporting the Statements on Acadia's stalled leveraged buyout deal, Mr. Faber relied on certain source(s) "close to the situation" – the identity, or even identifying details, of whom he does not now recall.  Faber Decl. ¶¶ 4-6 & Ex. A at 16:57.  But as Mr. Faber has explained, this is exactly the type of reporting for which he would have relied on confidential sources, as it involved sensitive commercial information and would have been an interview granted upon the condition of anonymity.  *Id.* ¶¶ 3, 6; *see also Holmes*, 22 N.Y.3d at 310 (noting that "safeguarding the anonymity of those who provide information in confidence is perhaps the core principle of New York's journalistic privilege").  By this Subpoena, the Pension Funds seek precisely that one piece of information from Mr. Faber that garners the highest degree of protection under the applicable federal case law: his confidential source(s) for the Statements.  McNamara Decl. ¶ 5.

Because the Pension Funds seek confidential newsgathering information, "disclosure may be ordered only upon a clear and specific showing that the information is: [1] highly material and relevant, [2] necessary or critical to the maintenance of the claim, and [3] not obtainable from other available sources."  *In re Petroleum Prod. Antitrust Litig.,* 680 F.2d at 7.  If a party fails to satisfy any one of these factors, it does not overcome the privilege.  *See Persky v. Yeshiva Univ.*, No. 1:01-cv-5278, 2002 WL 31769704, at *4 (S.D.N.Y. Dec. 10, 2002) (subpoenaing party did not overcome the privilege where it satisfied the first two factors, but not the third).  For the following reasons, Pension Funds cannot satisfy any of these three factors.

### 1. The Pension Funds Cannot Make a Clear and Specific Showing that Mr. Faber's Testimony Is Highly Material or Relevant.

Courts have held that a party cannot make a "clear and specific showing" adequate to satisfy the first factor where the party seeks discovery based merely on "speculation" or a "hunch"

that the subpoenaed journalist *may* have material information.  *See Pugh v. Avis Rent A Car Sys., Inc.*, No. M8-85, 1997 WL 669876, at *4 (S.D.N.Y. Oct. 28, 1997) (granting motion to quash upon finding that the "subpoena [wa]s based only upon Defendant's 'hunch' that the *60 Minutes* interview outtakes . . . must contain some information useful to its argument" which amounted to "nothing more than speculation"); *United States ex rel. Vuitton Et Fils, S.A. v. Karen Bags, Inc.*, 600 F. Supp. 667, 671 (S.D.N.Y. 1985) (holding that a "hunch" is "insufficient as a specific showing of need for 'highly material' or 'critical' information").

Here, Pension Funds' central, affirmative legal claims do not involve, or even mention, Mr. Faber, the CNBC Segment, or the Statements.  McNamara Decl. Ex. B.  Instead, in an effort to *rebut* one of Acadia's several arguments *in opposition to class certification*, the Pension Funds seek Mr. Faber's testimony in the hope that it would validate their hunch that Acadia itself, or one of its agents or employees, was the source for the Statements.  The Pension Funds, however, did not raise this entirely speculative theory in any publicly available filing submitted in the underlying litigation, let alone provide any factual basis for the conjecture.

Because the Pension Funds seek *speculative* information about *hypothetical* leaks from Acadia to Mr. Faber that are in no way central to their allegations, either at class certification or at summary judgment, they engage in nothing more than the type of unfounded fishing expedition that courts repeatedly hold insufficient to satisfy the first factor.  *See, e.g.*, *Pugh*, 1997 WL 669876, at *4.  Indeed, the Second Circuit was confronted with an analogous situation in *In re Petroleum Products*, which involved States' antitrust suits against several oil companies.  680 F.2d at 7.  There, the States hypothesized that the oil companies' price-fixing conspiracy was furthered through leaks to trade publications, although they did not specifically make any allegations or present any evidence to substantiate that conjecture.  *Id.* at 7-8.  Instead, the States subpoenaed a

publisher for confidential source information.  *Id.* at 8.  Reversing the contempt order entered upon the publisher's refusal to comply with the subpoena, the Second Circuit concluded that such allegations bore only a "remote and tenuous" relevance and confidentiality could not be "overcome simply by suggesting—with no basis to support the assertion—that the reporter may unknowingly have been used by those sources in their illegal activities."  *Id.*

Moreover, even if the Pension Funds *had* pled or presented evidence of Acadia's leak to Mr. Faber, a review of their lengthy Complaint reveals that such information, even if proven, is ultimately peripheral to the key issues in the Action.  As explained above, the gravamen of the Pension Funds' claims is that Acadia engaged in a scheme to deceive the public and their investors regarding the operations of their healthcare facilities; caused their investors financial losses when the truth emerged; and engaged in insider trading prior to those disclosures.  *E.g.*, McNamara Decl. Ex. B ¶ 3.  None of those claims reference or involve Mr. Faber, the CNBC Segment, or the Statements, and so the Pension Funds cannot clearly and specifically show that Mr. Faber's testimony would be relevant, let alone *highly material or relevant*, to those claims.

### 2. The Testimony Sought Is Not Necessary or Critical to the Maintenance of the Pension Funds' Claims Against Acadia, Either at Class Certification or Summary Judgment.

Information that is merely useful or potentially beneficial to a party's legal claims does not satisfy the second factor of the test.  Instead, the Second Circuit has underscored that information is not "necessary or critical" to a claim unless the claim "virtually *rises or falls* with the admission or exclusion of the proffered evidence."  *Persky*, 2002 WL 31769704, at *3 (quoting *In re Appl. to Quash Subpoena to Nat'l Broad. Co.* (*Graco*), 79 F.3d 346, 351 (2d Cir. 1996)) (emphasis added); *see also Baker*, 470 F.2d at 783 (the information must "go to the heart of [the] case").  As such, information that is "cumulative of other evidence" can never be "necessary or critical" to a

claim.  *See, e.g.*, *In re Behar*, 779 F. Supp. 273, 275 (S.D.N.Y. 1991); *United States v. Marcos*,

No. 87 CR 598, 1990 WL 74521, at *4 (S.D.N.Y. June 1, 1990).

At the outset, because Mr. Faber does not recall his source(s), his testimony can in no way

be helpful to the Pension Funds' legal claims.  But even if his memory could somehow be refreshed

with regard to his source(s), the Pension Funds cannot possibly establish that any of the legal

claims in its Complaint against Acadia "virtually rise or fall" with the identity of the source(s) of

the Statements or any other newsgathering information they could potentially gather from

Mr. Faber.  Revelation of Mr. Faber's source(s) for the status of the leveraged buyout would have

negligible bearing on the Pension Funds' allegations that Acadia engaged in a systematic campaign

to inflate the market price of its securities, defraud its investors, and engage in insider trading.  *See*

*In re Behar*, 779 F. Supp. at 275 (information sought not necessary or critical where the party had

"18 other pieces of evidence in support of its [] claim").  This case appears to involve expansive,

complex, years-long discovery, with reams of documents exchanged, numerous witness

depositions, and dueling expert reports on both sides.  At this late date in the process, it defies

logic for the Pension Funds to claim that Mr. Faber is somehow an essential witness in the case

when he did nothing more than make brief remarks about Acadia's stalled buyout nearly four years

ago.  Instead, this is exactly the sort of "unnecessary enmeshing of the press in litigation that arises

from events they cover" from which the reporter's privilege protects.  *Schoolcraft v. City of N.Y.*,

No. 1:10-cv-6005, 2014 WL 1621480, at *2 (S.D.N.Y. Apr. 22, 2014) (citation omitted).

The Pension Funds cannot contend that Mr. Faber's testimony is critical or necessary to its

ability to rebut one of Acadia's class certification arguments, namely, that the Pension Funds fail

to establish the "predominance of reliance" because the Statements, and not the November 16,

2018 *Seeking Alpha* article, objectively caused Acadia's stock price drop.  As a threshold matter,

the Subpoena is premature because the Middle District of Tennessee has not yet ruled on the certification motion.  If it denies the motion, the Subpoena seeks unnecessary testimony.  Or if the court grants the motion, it may well adopt the Pension Funds' independent theory of reliance under *Affiliated Ute*, *see infra* n.7, to which Mr. Faber's testimony is entirely irrelevant.

Even setting aside the prematurity of the Subpoena, at best, Acadia's argument solely hinges on whether the *publicly aired* Statements resulted in Acadia's stock price decline, which in no way implicates Mr. Faber's confidential source(s) or his newsgathering process.  Notably, the Pension Funds have *already* thoroughly responded to this issue in their class certification briefing, without Mr. Faber's testimony.  McNamara Decl. Ex. L at 9-13.  Their counter-arguments reveal that Mr. Faber's testimony is not only unnecessary on that issue, but also unrelated to the Pension Funds' primary basis for rebuttal, *i.e.*, that Acadia's expert engaged in a flawed analysis of the stock trades.  *Id.* at 10-11.  None of these bases for rebuttal depend on Mr. Faber's testimony about his source(s).

Importantly, the Pension Funds respond in the alternative to Acadia's opposition that even if the Statements solely caused the stock price drop, Acadia would *still* be unable to prove a complete lack of price impact because its "alleged misstatements concerning quality of care, staffing, and regulatory compliance . . . and the failed private equity buyout are linked."  *Id.* at 11.  Put simply, the Pension Funds concede that the price impact issue rises and falls on the relationship between Acadia's alleged misrepresentations and its stock prices, and *not* on the Statements, much less Mr. Faber's newsgathering process.  *Baker,* 669 F.3d at 108 ("The test is not merely that the material be helpful or probative, but *whether or not   . . . the action may be presented without it.*") (emphasis added) (citation omitted).[7]

---

[7] Lastly, with respect to class certification, Pension Funds also advance a separate theory of presumed reliance to establish predominance, which does not implicate the Statements at all.  In their response to Acadia's sur-reply in

After effectively conceding in their certification briefing that Mr. Faber's testimony is of virtually no relevance to the already fully-briefed class certification motion, the Pension Funds will no doubt claim that the Mr. Faber's testimony is somehow required in the future at summary judgment.  For instance, the Pension Funds may speculatively argue that if Acadia indeed leaked to Mr. Faber, this supports "loss causation," a legal element that a party must prove in securities fraud claims involving publicly traded securities.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (describing elements of such claims).  The Pension Funds will likely seek to establish loss causation by the "corrective disclosure theory," requiring them to show empirically "that the market reacted negatively to a corrective disclosure of fraud," relevantly here, the *Seeking Alpha* article.  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016); McNamara Decl. Ex. B ¶¶ 179-193 (setting forth the Pension Funds' loss causation theory).  But information about Mr. Faber's source(s) could not help them under that theory either. In assessing loss causation under the corrective disclosure theory, what "ultimately matters" is not what caused the corrective disclosure, but only whether it objectively caused the "*decline* in stock value that [the Pension Funds] claim as their loss."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) ("[T]o show loss causation, it is enough that the loss caused by the alleged fraud results from the 'relevant truth . . . leak[ing] out.'") (citation omitted).

Here, the objective events of the November 16, 2018 *Seeking Alpha* article and the Statements are both on the public record, and even if the Pension Funds could elicit from Mr. Faber

---

opposition to class certification, Pension Funds themselves argue that Acadia failed to rebut class certification based on the "*Affiliated Ute* presumption or [the Pension Funds'] scheme claims, which *independently support certification.*" *St. Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co. et al.*, ECF 147-1 at 1 (M.D. Tenn. filed May 6, 2022) (emphasis added).  Accordingly, the Pension Funds' reliance on a completely independent theory of presumed reliance completely disconnected from the Statements only further undercuts their ability to claim that Mr. Faber's testimony is in any way necessary or critical to their case.

the identity of the source(s) – which they cannot – such a subjective characterization would not aid them on the loss causation element.  Instead, the Pension Funds must empirically show that "an economic loss occurred after the truth behind the misrepresentation or omission became known to the market."  *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009).  They are free to marshal expert analysis – which they have already done at class certification – to determine whether either, or both, sets of statements revealed Acadia's alleged fraud and triggered Acadia's stock price decline.  Nothing else that the Pension Funds could obtain from Mr. Faber is plausibly relevant to the loss causation element.

Even as to the other legal elements of materiality or Acadia's scienter for the Pension Funds' claims, the proper sources for such discovery are experts, the investors, and Acadia, not Mr. Faber.[8]  Mr. Faber's testimony cannot possibly shed light on how a "reasonable investor" would have viewed his Statements, which inherently requires examination of how the Statements were perceived by the public, not how they were gathered or from whom.  Nor can Mr. Faber provide a window into Acadia's intentions or state of mind with respect to the corrective disclosures.  Instead, the Pension Funds should properly inquire with the investors and/or Acadia, through interrogatories or a 30(b)(6) deposition, for example, whether anyone ever communicated

---

[8] Mr. Faber's testimony would also have no bearing on the issue of materiality or Acadia's scienter.  Materiality is established "only if *a reasonable investor* would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'"  *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014) (emphasis added) (citations omitted).  As for scienter, the Pension Funds must prove that *Acadia* had a "strong inference of intent to 'deceive, manipulate or defraud,'" which can be established by alleging "facts showing [Acadia] had both motive and opportunity to commit fraud" or "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 241 (S.D.N.Y. 2006) (citation omitted).  These issues are properly addressed via testimony from experts, Acadia, and other relevant parties, not invading privileges held by a journalist.

with Mr. Faber or was the source of the Statements, to the extent they argue that supports a scienter finding.

In short, Mr. Faber's testimony would bring nothing to the table, let alone be "critical or necessary" for any of the Pension Funds' claims or legal elements. Of course, this is all a moot point since Mr. Faber does not recall the identity of his source(s). Faber Decl ¶ 5. But even assuming *arguendo* that he could do so, any disclosure of those source(s) can *at most* and *only* be relevant if the Pension Funds' conjecture proves to be accurate and Acadia was indeed responsible for the Statements. That unfounded possibility would merely add another minor, immaterial data point to the Pension Funds' raft of factual allegations against Acadia. *See Sommer v. PMEC Assocs. & Co.*, No. 88 CIV. 2537 (JFK), 1991 WL 73858, at *3 (S.D.N.Y. May 1, 1991) (information sought not necessary or critical where defendant's "alleged feeding of false and misleading statements" to a newspaper was just one of over a dozen courses of wrongful conduct that the plaintiff alleged the defendant "undertook in furtherance of his vendetta").

In sum, no information obtainable from Mr. Faber would meaningfully go to any factual claim or legal element that the Pension Funds must establish, let alone constitute the *only* way of proving any of them. Because Mr. Faber's testimony – even if he could recall the source(s) for the Statements, which he does not – would be *at most* cumulative, and more likely irrelevant, the Pension Funds cannot satisfy the second factor. *Marcos*, 1990 WL 74521, at *4; *In re Behar*, 779 F. Supp. at 275.

### 3. The Information Sought is Obtainable from Other Sources.

Finally, the Pension Funds cannot demonstrate the testimony it seeks is unavailable from other sources. The federal reporter's privilege ensures that a journalist's First Amendment-protected newsgathering activities and information are invaded "only as a last resort." *Giuffre*, 221 F. Supp. 3d at 480 (citation omitted). To achieve that objective, the party seeking disclosure

must show that it has "exhaust[ed] all other available sources" for the information sought before it can force a reporter to reveal the information. *Graco*, 79 F.3d at 353. Simply asserting that such discovery would be burdensome is no justification. *Persky*, 2002 WL 31769704, at *4. For example, the Second Circuit has refused disclosure of a journalist's confidential newsgathering materials "despite the fact that '*hundreds of depositions*' had been taken and others might be necessary." *Id.* (emphasis added) (quoting *In re Petroleum Prods.*, 680 F.2d at 7, and noting that Second Circuit "also suggested that the taking of 60 or 65 depositions may be a reasonable prerequisite to disclosure"); *see also Graco*, 79 F.3d at 353 (quashing subpoena where party seeking discovery failed to attempt to obtain information from non-journalist sources); *In re Forbes Mag.*, 494 F. Supp. 780, 781 (S.D.N.Y. 1980) (plaintiffs failed to exhaust "all possible alternative means of discovering the information sought" where they deposed only the corporate chairman on the "issue of who was the source of [the journalist's] assertion," but failed to ask the "same information of other [corporate] executives"); *In re Behar*, 779 F. Supp. at 276 (party must "interview[] its own agents" or "depose all of the persons identified" in the underlying article before any deposition would be warranted).

Here, the Pension Funds represented to Mr. Faber's counsel that they apparently have unsuccessfully sought the identity of Mr. Faber's confidential source from certain alternative sources. McNamara Decl. ¶ 5. But given that the Pension Funds' entire basis for seeking Mr. Faber's testimony is its purported theory that Acadia was the source, this position strains credulity. Either the Pension Funds have conjured that theory out of thin air, or they have some basis for so believing. If the latter, the Pension Funds have the obligation to pursue all possible evidentiary routes from Acadia, private investors, or any other relevant party, prior to impinging on Mr. Faber's First Amendment-protected activity. *In re Petroleum Prods.*, 680 F.2d at 9

(engaging in such a fact-finding "process . . . may also identify the actual purveyors of [the] information [at issue], thus obviating the need to inquire of [the journalists]").  Yet, the Pension Funds have not provided specific indication that they have  run all alternative sources to the ground.  And if they have – and those alternative sources have affirmatively refuted that Acadia was Mr. Faber's confidential source – then the Pension Funds cannot conduct a "fishing expedition" and depose a journalist in the vain hope that he will contradict those findings.  *Giuffre*, 221 F. Supp. 3d at 477.

In sum, the Pension Funds have failed to satisfy each of the three required factors  to overcome the qualified privilege for confidential information, and thus the Subpoena must be quashed.

### B.  To the Extent the Subpoena Calls for Testimony about Non-Confidential Newsgathering Materials, the Pension Funds Still Cannot Satisfy their Burden of Overcoming the Reporter's Privilege.

Even if this Court finds that Mr. Faber's contemplated testimony involves non-confidential newsgathering materials, or assuming *arguendo* that the Pension Funds could tailor the deposition so narrowly that they avoided confidential subject matter entirely, the Pension Funds still cannot overcome the qualified test for obtaining such materials under the federal reporter's privilege, as the Subpoena necessarily seeks information concerning Mr. Faber's unpublished newsgathering processes.  *See In re Consumers Union of U.S., Inc.*, 495 F. Supp. 582, 586 (S.D.N.Y. 1980) ("Regardless whether [the subpoenaing party] seek[s] confidential sources, they seek to examine the reportorial and editorial processes.").

The courts of this Circuit have emphasized that the reporter's privilege extends to non-confidential unpublished materials because otherwise First Amendment protections would be impermissibly burdened "if it were to become 'standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of

information supporting their claims.'" *Giuffre*, 221 F. Supp. 3d at 477 (quoting *Gonzales*, 194 F.3d at 35). Those burdens include not only the "heavy costs of subpoena compliance" but also the symbolic and practical harms of "making journalists appear to be an investigative arm of the judicial system, the government, or private parties." *Id.*; *see also United States v. Shah*, No. 1:19-cr-833 (SHS), 2022 WL 1422252, at *3 (S.D.N.Y. May 5, 2022) (chilling effect would result "because of the likelihood that [sources] would be sucked into litigation") (citation omitted).

To overcome the privilege for non-confidential newsgathering information, the applicant must "show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Gonzales,* 194 F.3d at 36. The Pension Funds cannot satisfy either prong.

### 1. The Testimony Sought is Not of Likely Relevance to a Significant Issue in the Case.

Courts frequently reject requests to obtain unpublished non-confidential information based on nothing more than "general claims that the [discovery is] likely to contain relevant material," and even a showing of a "particularized need" for the information sought may not suffice. *In re McCray, Richardson, Santana, Wise, Salaam Litig.*, 991 F. Supp. 2d 464, 470 (S.D.N.Y. 2013) (affirming magistrate's grant of motion to quash). Importantly, non-confidential newsgathering information may not even be sought on the odds they might be able to be used to refresh witnesses' recollections. *Sikelianos v. City of N.Y.*, No. 05-civ-7673, 2008 WL 2465120, at *1 (S.D.N.Y. June 18, 2008) (quashing subpoena seeking unpublished photographs of the plaintiff's arrest for use to refresh witnesses' recollections).

Here, the Pension Funds cannot satisfy the relevancy requirement because, as explained *supra*, the testimony the Subpoena seeks is "merely duplicative or serv[es] a 'solely cumulative purpose.'" *Schoolcraft,* 2014 WL 1621480, at *3 (citation omitted). The Pension Funds' lawsuit

20

against Acadia involves allegations of a complicated, years-long scheme to defraud, conceal, and profit from insider trading.  The Pension Funds' Complaint does not even mention Mr. Faber or the CNBC Segment, and as discussed *supra*, none of the legal elements it must prove remotely involve Mr. Faber's reporting or newsgathering.  To date, Mr. Faber's reporting has only come up with respect to one narrow aspect of the Pension Funds' now fully-briefed class certification motion, and even there, the issue at hand in no way relates to Mr. Faber's actual source(s), but simply whether that *published* report was the sole reason for Acadia's stock price drop.  Therefore, there is no nexus between the reporting and any *significant* issue in the case, and the Pension Funds are not permitted to go on a fishing expedition into Mr. Faber's newsgathering process simply because they have the vaguest inkling that something helpful for their legal claims might emerge. *See In re McCray*, 991 F. Supp. 2d at 470 (quashing subpoena where the parties seeking disclosure simply made "general claims" that the information sought is "likely to contain relevant material"). That sort of "sifting" inquiry is precisely the type proscribed under the reporter's privilege. *Gonzales*, 194 F.3d at 35; *see also Shah*, 2022 WL 1422252, at *4; *Sikelianos*, 2008 WL 2465120, at *1.

### 2.    The Pension Funds Cannot Establish that the Information Sought is Not Reasonably Obtainable from Other Available Sources.

Even with non-confidential newsgathering information, courts still require a significant degree of "[e]xhaustion of all other available sources of information."  *New England Teamsters & Trucking Indus. Pension Fund v. New York Times Co.*, No. 1:14-mc-59, 2014 WL 1567297, at *2-3(S.D.N.Y. Apr. 17, 2014) (collecting cases); *see also In re McCray*, 991 F. Supp. 2d at 470 ("Courts in the Second Circuit have quashed subpoenas when similar information could be obtained elsewhere."); *Lebowitz v. City of N.Y.*, 948 F. Supp. 2d 392, 395 (S.D.N.Y. 2013) (exhaustion requirement not met where "at least three other witnesses identified by the plaintiff in

discovery may have observed the events in question"). For example, materials are "reasonably unobtainable . . . when the only other party who knows the information cannot be deposed." *In re McCray*, 991 F. Supp. 2d at 471 (discussing *United Sates v. Treacy*, 639 F.3d 32, 43 (2d Cir. 2011), finding that "the reporter was the only potential witness because the criminal Defendant possessed an absolute Fifth Amendment right not to testify"); *see also New England Teamsters*, 2014 WL 1567297, at *5 ("Mere belief that an alternative source is unwilling to provide the information, without more, cannot compel a finding that information is not reasonably obtainable.").

The Pension Funds cannot satisfy this exhaustion requirement. Even if they have sought or attempted to seek this information from *some* avenues, they must pursue *all* other possible sources of information. *Schoolcraft*, 2014 WL 1621480, at *3. That is so even if the Pension Funds believe that an "alternative source is unwilling to provide the information." *New England Teamsters*, 2014 WL 1567297, at *5. The Pension Funds have not demonstrated that they meet this burden, and so this Court should not permit them to rely on Mr. Faber as their own investigative tool. *See Marcos*, 1990 WL 74521, at *2 ("Many doors will be closed to reporters who are viewed as investigative resources of litigants. The hindrance to the free flow of information which accompanies this perception is inimical to the First Amendment.").

It bears repeating that Mr. Faber does not recall his source(s) – the sole basis for which the Pension Funds' counsel has stated that they wish to depose him. Faber Decl. ¶ 5. But even if Mr. Faber's recollection could somehow be refreshed as to his sources, or if the Pension Funds seek his testimony on any other non-confidential newsgathering materials, the Subpoena should still be quashed because the Pension Funds have not shown that Mr. Faber's testimony would be relevant to a significant issue in the case, nor that the information sought is unavailable elsewhere.

## CONCLUSION

For the foregoing reasons, this Court should quash the Subpoena issued to Mr. Faber.

Dated: New York, New York
May 20, 2022

Respectfully submitted,

/s/ *Elizabeth A. McNamara*
Elizabeth A. McNamara
Meenakshi Krishnan (*pro hac vice* forthcoming)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 603-6437
lizmcnamara@dwt.com
meenakshikrishnan@dwt.com

Daniel M. Kummer
Senior Vice President, Litigation
NBCUNIVERSAL MEDIA, LLC
30 Rockefeller Plaza, Rm. 620-537
New York, New York 10112
Telephone: (212) 664-4017
daniel.kummer@nbcuni.com

*Attorneys for Petitioner David Faber*