# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | CIVIL ACTION NO.: 3:18-cv-00988 |
| Plaintiff, | ) ) ) | Judge Eli J. Richardson<br>Magistrate Judge Alistair Newbern |
| v. | ) ) ) |  |
| ACADIA HEALTHCARE COMPANY, INC., *et al.*, | ) ) ) | |
| Defendants, | ) ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT

Dated: May 31, 2019

Steven A. Riley (BPR # 006258)
Milton S. McGee, III (BPR # 024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 320-3700
sriley@rwjplc.com
tmcgee@rwjplc.com

Jessica P. Corley (*pro hac vice*)
Lisa R. Bugni (*pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street N.E.
Atlanta, GA 30309
(404) 572-4600
jcorley@kslaw.com
lbugni@kslaw.com

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 4

ARGUMENT ............................................................................................................. 5

I.    THE COMPLAINT FAILS TO ALLEGE AN ACTIONABLE MISSTATEMENT OR
      OMISSION. ...................................................................................................... 6

      A.    The Safe Harbor Shields The Challenged Forward-Looking Statements. ................... 6

      B.    The Challenged "Quality Care" Statements Are Not Actionable.............................. 12

      C.    The Substantial Regulatory Compliance Opinion Is Not Actionable......................... 15

II.   THE COMPLAINT FAILS TO ALLEGE A STRONG INFERENCE OF SCIENTER. .... 17

      A.    Stock Sales.............................................................................................. 17

      B.    Defendants' Monitoring of Quality Control Metrics................................................ 21

      C.    The Incentive Compensation System. ......................................................... 21

      D.    Corporate Turnover. ................................................................................. 22

III.  PLAINTIFFS' SECTION 20(a) CLAIMS SHOULD BE DISMISSED. ............................ 25

CONCLUSION........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AFC Enterprises, Inc. Sec. Litig.*,
    348 F. Supp. 2d 1363 (N.D. Ga. 2004) ...........................................................................19, 20

*Bondali v. Yum! Brands, Inc.*,
    620 F. App'x 483 (6th Cir. 2015) .........................................................................................6

*Campbell v. Lexmark Int'l Inc.*,
    234 F. Supp. 2d 680 (E.D. Ky. 2002) .................................................................................20

*City of Dearborn Heights Act 345 Police & Ret. Sys. v. Align Tech. Inc.*,
    856 F.3d 605 (9th Cir. 2017) .............................................................................................23

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) .........................................................................................3, 12

*In re Dell Inc., Sec. Litig.*,
    591 F. Supp. 2d 877 (W.D. Tex. 2008).............................................................................18

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)...............................................................................................23

*Grillo v. Tempur-Pedic Int'l, Inc.*,
    553 F. Supp. 2d 809 (E.D. Ky. 2008) ...................................................................17, 18, 20

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) .............................................................................................9

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) ...............................................................................................9

*Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund
    v. Omnicare, Inc.*,
    583 F.3d 935 (6th Cir. 2009) .......................................................................................12, 21

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...............................................................................................11

*In re Interpool, Inc. Sec. Litig.*,
    No. 04-321, 2005 WL 2000237 (D.N.J. Aug. 17, 2005) .......................................................23

*Jackson County Employees' Ret. Sys. v. Acadia Healthcare Company, Inc.*,
    Case No. 3:18-cv-00286 (M.D. Tenn.) ..................................................................................5

Case 3:18-cv-00988   Document 41   Filed 05/31/19   Page 3 of 33 PageID #: 838

*In re Keithley Instruments, Inc. Sec. Litig.*,
    268 F. Supp. 2d 887 (N.D. Ohio 2002)...............................................................................19

*In re Leapfrog Enter., Inc. Sec. Litig.*,
    200 F. Supp. 3d 987 (N.D. Cal. 2016) ...............................................................................23

*Ley v. Visteon*,
    543 F.3d 801 (6th Cir. 2008), *abrogated on other grounds, Doshi v. Gen.*
    *Cable Corp.*, 823 F.3d 1032 (6th Cir. 2016)....................................................6, 17, 25

*In re Longtop Financial Technologies Ltd. Sec. Litig.*,
    910 F. Supp. 2d 561 (S.D.N.Y. 2012).............................................................................1, 21

*Miller v. Champion Enterprises Inc.*,
    346 F.3d 660 (6th Cir. 2003) ..........................................................................7, 9, 11

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) ........................................................................7, 15, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015).....................................................................................................15

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
    614 F. App'x 237 (6th Cir. 2015) ...................................................................................8

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
    307 F. Supp. 3d 583 (S.D. Tex. 2018) ...........................................................................16

*Ret. Sys. v. CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012)...............................................................................................23

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) .........................................................................................20

*In re SCB Computer Technology, Inc. Sec. Litig.*,
    149 F. Supp. 2d 334 (W.D. Tenn. 2001)..........................................................................2

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) .....................................................................................19, 20

*Stavroff v. Meyo*,
    987 F. Supp. 987 (N.D. Ohio 1995), *aff'd*, 129 F.3d 1265 (6th Cir. 1997) ............................19

*Teachers' Ret. Sys. Of LA v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) .....................................................................................18, 20

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)....................................................................................1, 2, 6, 17

*In re The Great Atlantic & Pacific Tea Co. Sec. Litig.*,
    103 F. App'x 465 (3d Cir. 2004) ........................................................................23

*U.S. v. Stafford*,
    721 F.3d 380 (6th Cir. 2013) ...........................................................................6

*Zwick Partners, LP v. Quorum Health Corp.*,
    No. 3:16-cv-02475, 2019 WL 1450546 (M.D. Tenn. Mar. 29, 2019)...........................2, 8, 11

**Statutes**

15 U.S.C. § 78t(a) ......................................................................................25

15 U.S.C. § 78u–4(b) ..............................................................................6, 17

15 U.S.C. § 78u-5 ...................................................................................7, 8

Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4, *et seq.* ...........................1

**Other Authorities**

H.R. Conf. Rep. No. 104-39, at 44 (1995)......................................................11

Fed. R. Civ. P. 9(b) ...................................................................................2

# INTRODUCTION

Defendant Acadia Healthcare Company, Inc. ("Acadia" or the "Company") is a provider of behavioral healthcare services that derives most of its revenues from treating psychiatric patients "that are either a threat to themselves or to others."[1] Given the nature of the patient population, Acadia, like any other behavioral healthcare provider, will occasionally have patient incidents that may lead to regulatory investigations or negative publicity. Acadia, therefore, repeatedly disclosed to investors throughout the proposed class period in this case that the Company was subject to these risks.[2] And some of the risks Acadia warned of materialized: two negative articles were published about alleged patient incidents at Acadia's facilities. Trying to capitalize on these negative articles, one of which was written by a company that held a short interest[3] in Acadia, and, thus, stood to gain if the stock price declined, Plaintiffs have manufactured a securities fraud claim against Acadia and three of its class period officers.[4]

But a claim for securities fraud must be based on more than alleged patient incidents and criticisms of Acadia's business. It requires that Defendants make actionable misstatements or omissions to investors with an intent to defraud. And, given that this case is governed by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4, *et seq.* (the "PSLRA"), the Complaint must meet the PSLRA's heightened pleading requirements. *See Tellabs, Inc. v. Makor*

---

[1] *See* Ex. 1 (2018 10-K) at 5. In ruling on a motion to dismiss, the court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). All of the documents attached as exhibits hereto are incorporated into the Complaint by reference and thus properly considered in ruling on this motion.

[2] *See, e.g.*, Ex. 2 (2015 10-K) at 19-41.

[3] "[S]hort sellers operate by speculating that the price of a security will decrease . . . [so] they have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *In re Longtop Financial Technologies Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012).

[4] The "Individual Defendants" are Joey Jacobs, CEO during the alleged class period, Brent Turner, President during the alleged class period, and David Duckworth, CFO during the alleged class period.

*Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). "[T]he PSLRA imposes even more stringent pleading requirements on plaintiffs than Rule 9(b) requires." *In re SCB Computer Technology, Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 344 (W.D. Tenn. 2001). Congress enacted the PSLRA because "[p]rivate securities fraud actions . . . can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs*, 551 U.S. at 313. In an effort to curb such abuses by private securities fraud litigants, Congress incorporated "control measures" in the PSLRA, including "exacting pleading requirements." *Id.*

Here, Plaintiffs attempt to state a claim by alleging that Defendants issued misleading statements about (i) Acadia's projected earnings guidance[5] for the fiscal year 2017, (ii) the Company's commitment to providing "quality care," and (iii) management's opinion that the Company was operated in substantial compliance with laws and regulations. *See, e.g.*, Compl. ¶¶ 112-47, 149-56, 159-77. Each of these theories, however, is fundamentally flawed, and the Complaint fails to meet the PSLRA's heightened pleading requirements.

*First*, the statements regarding Acadia's projected earnings for 2017 cannot support a claim of securities fraud because those are forward-looking statements that the PSLRA's Safe Harbor immunizes from liability. As Judge Crenshaw recently held, "if the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, it is protected and non-actionable in a securities fraud action regardless of the defendant's actual [or alleged] state of mind." *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-02475, 2019 WL 1450546, *3 (M.D. Tenn. Mar. 29, 2019). Acadia's challenged forward-looking statements were accompanied by sufficient cautionary language, and, thus, should be dismissed from the Complaint as non-actionable.

*Second*, the challenged statements regarding Acadia's commitment to "quality care"

---

[5] Earnings guidance is the company's prediction of its financial results for the year.

cannot support a claim because these are precisely the type of "puffery" statements that the Sixth Circuit recognizes are inactionable under the securities laws—as these are the types of statements that are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005).

The "quality care" statements fail for an additional reason: the facts Plaintiffs allege should have been disclosed were actually disclosed, repeatedly. The Complaint alleges that these quality care statements are misleading because Defendants failed to disclose that Acadia was cutting staffing at its facilities, which caused some of those facilities to experience patient incidents. *See* Compl. ¶¶ 130-148. But the very documents that the Complaint alleges are misleading for failing to disclose these facts repeatedly disclose (a) details of employee numbers and staffing costs throughout the proposed class period, and (b) the fact that Acadia's facilities did experience patient incidents. Indeed, not only did Defendants disclose these facts to investors, but the staffing figures disclosed actually show that Acadia *increased* employee numbers and same-facility staffing costs year over year. Thus, there is no basis to Plaintiffs' claim that these "quality care" statements are misleading due to alleged staffing cuts.

***Third***, the Complaint challenges the statement that Defendants believed Acadia was in substantial compliance with applicable laws and regulations, but that is a statement of opinion that is actionable only when the Complaint alleges particularized facts showing that the speaker did not believe the statement at the time it was made. The Complaint fails to allege any such facts.

Even setting aside these deficiencies, the Complaint fails for an additional, independent reason: Plaintiffs do not allege facts giving rise to a strong inference that Defendants acted with scienter, the state of mind required by the PSLRA. None of the purported factors cited in the

Complaint supports an inference of scienter. Rather, in each case, the more compelling inference is an innocent one, which defeats Plaintiffs' claims. And because Plaintiffs fail to state any claim for violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), their Section 20(a) claim likewise fails, as that claim depends on first stating a Section 10(b) violation.

For these reasons, and as discussed in more detail below, Defendants respectfully request that the Court dismiss the Complaint.

## BACKGROUND

Headquartered in Franklin, Tennessee, Acadia is a company that was founded in 2005 and that now operates more than 570 behavioral healthcare facilities in the U.S., Puerto Rico, and the United Kingdom. Compl. ¶¶ 2, 28. Through these facilities, Acadia treats all ages of patients with a broad range of conditions. *Id.* ¶ 29. At the most intensive end of the spectrum are Acadia's acute inpatient psychiatric facilities, which house "patients that are either a threat to themselves or to others." *See* Ex. 1 (2018 10-K) at 5. Acadia also operates specialty treatment centers that primarily provide services "to patients who abuse addictive substances such as alcohol, illicit drugs or opiates, including prescription drugs," but that also "treat other addictions and behavioral disorders such as chronic pain, sexual compulsivity, compulsive gambling, mood disorders, emotional trauma and abuse." *Id.* at 6. In addition, Acadia operates "[r]esidential treatment centers [that] treat patients with behavioral disorders in a non-hospital setting." *Id.* at 7.

Throughout the proposed class period, Acadia was a success story. Defendants grew the business from 78 facilities and $1 billion in revenue in 2014 to 583 facilities and $3 billion in revenue in 2018. *See* Ex. 3 (2014 10-K) at 41, 43; Ex. 1 (2018 10-K) at 44, 46.

Despite Acadia's consistent success, Plaintiffs, alleged investors in Acadia, have brought this suit alleging damages as a result of Acadia stock price declines that occurred on three days.

First, on October 24, 2017, Acadia announced, in part, that its operations in the United

Kingdom experienced a lower census and higher operating costs than anticipated and that Acadia was lowering its forward-looking statements of earnings guidance for 2017. Compl. ¶¶ 180-181. The reason for the lowered earnings guidance was wholly unrelated to any alleged patient incidents. The price of Acadia's stock declined from a closing price of $44.12 per share on October 24, 2017 to an intraday low of $30.91 per share on October 25, 2017. Compl. ¶ 184. Approximately one year later, on October 1, 2018, the first complaint in this action was filed, alleging a claim based only on Acadia's 2017 forward-looking statements of earnings guidance.[6] *See* Dkt. No. 1.

Second, Plaintiffs added allegations in the active consolidated Complaint of a stock price decline that occurred after October 11, 2018, when Aurelius Value, a short seller of Acadia stock, published a short report citing to alleged patient incidents and staffing issues. Compl. ¶¶ 187-189.

Third, Plaintiffs also added allegations of a stock price decline following a November 16, 2018, *Seeking Alpha* short report regarding similar issues. *Id.* ¶¶ 190-192.

Based in large part on the allegations in the October 2018 short-seller report, the Complaint challenges the three categories of statements noted above. *See supra* at 2. For the sake of brevity, this brief discusses examples of challenged statements from each category and attaches as Exhibit 4 a chart containing all of the statements challenged in the Complaint, along with a description of the reason for why each statement cannot support a claim for securities fraud.

## ARGUMENT

The elements of a Section 10(b) claim require the plaintiff to "allege: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) [that was] made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing

---

[6] On March 14, 2018, the firm that initiated this action filed a securities complaint against Defendants alleging a claim based on Acadia's forward-looking statements and the announcement on October 24, 2017. *See Jackson County Employees' Ret. Sys. v. Acadia Healthcare Company, Inc.*, Case No. 3:18-cv-00286 (M.D. Tenn.). That complaint was voluntarily dismissed.

them injury." *Ley v. Visteon*, 543 F.3d 801, 806 (6th Cir. 2008), *abrogated on other grounds, Doshi v. Gen. Cable Corp.*, 823 F.3d 1032 (6th Cir. 2016). As to elements (1) and (3), the PSLRA further requires the plaintiff to plead with particularity (1) "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u–4(b)(1); and (2) "facts giving rise to a strong inference that the defendant acted with the required state of mind," *id.* § 78u–4(b)(2)—*i.e.*, "intention to deceive, manipulate, or defraud." *See Tellabs*, 551 U.S. at 321. Here, the Complaint fails to meet either of these heightened pleading requirements.

## I.   THE COMPLAINT FAILS TO ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION.

In analyzing whether the Complaint meets the initial hurdle of identifying an actionable false or misleading statement, the Court should "undertake[] a statement-by-statement analysis of objective falsity." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491–92 (6th Cir. 2015).[7] The Complaint must plead with particularity why each challenged statement, "when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *Id.* The Complaint falls short of these requirements for all of the challenged statements because, as explained below, (a) the forward-looking statements are not actionable pursuant to the Safe Harbor; (b) the quality care statements are inactionable puffery and, in any event, the facts Plaintiffs contend were not disclosed were, in fact, disclosed; and (c) the statement of regulatory compliance is an opinion statement for which Plaintiffs fail to plead the requisite facts to make it actionable.

### A.   The Safe Harbor Shields The Challenged Forward-Looking Statements.

The PSLRA Safe Harbor provides that Defendants "shall not be liable with respect to any

---

[7] Although *Bondali* is unpublished, it is persuasive authority, particularly given that there are no published Sixth Circuit decisions that address the statement-by-statement analysis point. *U.S. v. Stafford*, 721 F.3d 380, 397 (6th Cir. 2013).

forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). The Safe Harbor also expressly indicates that the Court's review should occur at the motion to dismiss stage. *Id.* § (e) ("On any motion to dismiss based upon subsection (c)(1), the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant."). To be clear, the Court is to consider at the outset only whether the statement is forward-looking and accompanied by meaningful cautionary language because, as the Sixth Circuit has explained, "if the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, ***a defendant's statement is protected regardless of the actual state of mind***." *Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) (emphasis added).[8] As explained below, the Safe Harbor protection applies.

     *1.    The Challenged Statements Are Forward Looking.* The PSLRA broadly defines a forward-looking statement to include, among other things, "(A) a statement containing a projection of revenues, . . . capital expenditures, . . . or other financial items"; "(B) a statement of the plans

---

[8] If the statement is ***not*** accompanied by meaningful cautionary language, then the second prong of the Safe Harbor still requires the Complaint to plead that Defendants made the forward-looking statements with "actual knowledge of their false or misleading nature" to be actionable. *Miller*, 346 F.3d at 672. Although it is not necessary to consider because the forward-looking statements at issue were accompanied by meaningful cautionary language, the Complaint also fails to meet the second prong. The Complaint pleads only the conclusory allegation that "Defendants had no reasonable basis to believe and did not, in fact, believe . . . that Acadia would meet its FY 2017 financial guidance." Compl. ¶ 178. "[G]eneral statements" do not allege "sufficient facts showing that" any of the Defendants had "actual knowledge." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 482 (6th Cir. 2014).

and objectives of management for future operations"; "(C) a statement of future economic performance"; and "(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)." 15 U.S.C. § 78u-5(i)(1). As shown in Exhibit 4, the statements challenged as false or misleading in Paragraphs 121 and 159-177 of the Complaint fall squarely within the PSLRA's definition of forward-looking statement.

Some of the challenged forward-looking statements are earnings guidance. Compl. ¶¶ 159, 162, 167, 168, 170, 173, 174, 175. "[F]inancial estimates regarding the anticipated earnings . . . [is the] type of guidance [that] falls squarely within the PSLRA's definition of forward-looking statements." *Zwick*, 2019 WL 1450546, at *7; *see also Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 243 (6th Cir. 2015) ("financial guidance falls within the . . . safe harbor").

The other forward-looking statements alleged in the Complaint likewise fall squarely within the PSLRA definition because they are "the plans and objectives of management for future operations," statements of "future economic performance," or "the assumptions underlying or relating to any" such future projections or plans for future operations. 15 U.S.C. § 78u-5(i)(1); *see* Compl. ¶ 121 (statements of the Company's business strategy), ¶¶ 160, 163, 164, 165, 171, 172, 176, 177 (expected increases in U.K. operations), ¶ 169 (expectations of cost synergies in the U.K.). Thus, all of the statements challenged in Paragraphs 121 and 159-177 of the Complaint are forward-looking under the PSLRA. *See* Ex. 4 (chart of challenged statements).

2. *The Challenged Forward-Looking Statements Were Identified As Such And Accompanied By Adequate Cautionary Language.* The forward-looking statements challenged in the Complaint also were identified as such when made and accompanied by meaningful cautionary language, rendering them inactionable under the Safe Harbor. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).

It is clear that a company "is not required to detail every facet or extent of [a] risk" to be

entitled to the protections in the safe harbor. *See Miller*, 346 F.3d at 678. Nor must a company necessarily warn of "the particular factor that ultimately causes the forward-looking statement not to come true." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999). Rather, a company must merely convey "information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 558-59 (6th Cir. 2001).

That standard is easily met for the forward-looking statements challenged in the Complaint. Every one of these statements was accompanied by language informing investors that these statements—projections of future earnings, future performance, or the assumptions underlying those projections—were forward-looking within the meaning of the PSLRA and that there could be no assurances that these projections would be met. *See, e.g.*, Ex. 5 (2/23/17 press release) ("This news release contains forward-looking statements. Generally words such as 'may,' 'will,' 'should,' 'could,' 'anticipate,' 'intend,' 'estimate,' 'plan,' 'continue,' and 'believe' or the negative of or other variation on these and other similar expressions identify forward-looking statements.")[9]

The Company also included specific, tailored risk factors that could cause actual performance to differ from the projections. For instance, Acadia's public SEC filings during the alleged class period regularly included the following cautionary language, among many others:

> Our facilities face competition for staffing that may increase our labor costs and reduce our profitability.
>
> ***
>
> Fluctuations in our operating results, quarter to quarter earnings and other factors, including incidents involving our patients and negative media coverage, may result in significant decreases in the price of our common stock.
>
> ***

---

[9] *See also* Ex. 6 (2013 10-K) at 26-27, Ex. 3 (2014 10-K) at 41-42, Ex. 2 (2015 10-K) at 46-47, Ex. 7 (2016 10-K) at 46-47, Ex. 8 (2017 10-K) at 44-45, Ex. 1 (2018 10-K) at 45-46, Ex. 9 (2/24/17 Earnings Call Transcript).

An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our securities.

\*\*\*

The majority of our revenue from our operations in the United Kingdom is not guaranteed and is being generated either from spot purchasing or under block or framework agreements where no volume commitments are given. In addition, there can be no assurance that we can achieve any fee rate increases in the future or will not suffer any fee rate decreases.

\*\*\*

Structural shifts in the United Kingdom behavioral healthcare market may adversely affect us.

\*\*\*

We made certain assumptions relating to the acquisition of Priory, CRC, and Partnerships in Care in our forecasts that may prove to be materially inaccurate, and we may be unable to achieve the related cost savings or synergies.

*See* Ex. 2 (2015 10-K) at 19-41.

Acadia echoed this cautionary language in investor calls, again informing investors of "important factors" that could cause actual results to differ from the projections. *See*, *e.g.*, Ex. 9 (2/24/17 Earnings Call Transcript) at 4 ("[t]his conference call may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, including statements, among others, regarding Acadia's expected quarterly and annual financial performance for 2017 and beyond. . . . You are hereby cautioned that these statements may be affected by important factors, among others, set forth in Acadia's filings with the Securities and Exchange Commission and in the company's fourth quarter news release").

Acadia's press releases likewise included sufficient cautionary language. In the February 23, 2017 press release containing the initial 2017 guidance, for example, Acadia included the following disclosure:

Forward-looking statements are based on current expectations and involve risks and uncertainties and our future results could differ significantly from those expressed

or implied by our forward-looking statements. Factors that may cause actual results to differ materially include, without limitation, (i) potential difficulties operating our business in light of political and economic instability in the U.K. and globally following the referendum in the U.K. on June 23, 2016, in which voters approved an exit from the European Union, or Brexit; (ii) the impact of fluctuations in foreign exchange rates, including the devaluation of the British Pound Sterling (GBP) relative to the U.S. Dollar (USD) following the Brexit vote; (iii) Acadia's ability to complete acquisitions and successfully integrate the operations of acquired facilities, including Priory facilities; (iv) Acadia's ability to add beds, expand services, enhance marketing programs and improve efficiencies at its facilities; (v) potential reductions in payments received by Acadia from government and third-party payors; (vi) the occurrence of patient incidents and governmental investigations, which could adversely affect the price of our common stock and result in incremental regulatory burdens; (vii) the risk that Acadia may not generate sufficient cash from operations to service its debt and meet its working capital and capital expenditure requirements; and (viii) potential operating difficulties, client preferences, changes in competition and general economic or industry conditions that may prevent Acadia from realizing the expected benefits of its business strategy. These factors and others are more fully described in Acadia's periodic reports and other filings with the SEC.

*See* Ex. 5.

These disclaimers were not merely boilerplate—they were "substantive, extensive, and tailored to the future-looking statements they reference." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 258 (3d Cir. 2009). As Judge Crenshaw recently recognized in *Zwick*, the presence of this cautionary language ends the inquiry. *Zwick*, 2019 WL 1450546, *8. That is because "for 'forward-looking statements' that are accompanied by meaningful cautionary language, the first prong of the safe harbor provided for in the PSLRA makes the state of mind irrelevant." *Miller*, 346 F.3d at 672; *see also* H.R. Conf. Rep. No. 104-39, at 44 (1995) (this prong "requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement"). Here, because the challenged forward-looking statements were identified as such and accompanied by meaningful cautionary language, the PSLRA safe harbor requires that they be dismissed. *Miller*, 346 F.3d at 672; *Zwick*, 2019 WL 1450546, *8.

**B.** **The Challenged "Quality Care" Statements Are Not Actionable.**

The next set of statements that Plaintiffs allege to be misleading are statements that Acadia provided "quality care" at its facilities. *See, e.g.*, Compl. ¶ 112 ("We strive to improve the operating results of our facilities by providing high quality services."); *id.* ¶ 116 ("Thank you all very, very much and always keep quality, doing the right thing, that is absolutely the first priority of this company is doing that."); *id.* ¶ 117 ("As with [the] whole Company, you know, we want to delivery good, quality care and not have any bad incidents."); *id.* ¶ 122 ("[O]ur number one goal is taking care of the patients, making sure they are receiving the quality care that they need."); *see also* Ex. 4 (chart of challenged statements). These statements are not actionable because (1) they constitute inactionable puffery, and (2) the facts the Complaint alleges should have been disclosed to make the statements not misleading were, in fact, disclosed.

*First*, these challenged statements by management as to the quality of the services Acadia offers are not actionable under the federal securities laws. *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009) ("liability does not attach to mere corporate puffery or statements of corporate optimism."). A company's references to providing "quality" services are a prime example of "loosely optimistic statements that are so vague and so lacking in specificity that no reasonable investor could ever find them important to the total mix of information available." *City of Monroe*, 399 F.3d at 669 (internal quotation omitted). Indeed, as the Sixth Circuit held, "statements describing a product in terms of 'quality' or 'best' . . . are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Id.* at 671. Thus, the "quality care" statements should be dismissed as inactionable.

*Second*, even if these statements were not puffery (which they are), they are not actionable for a separate and independent reason. The Complaint alleges that the "quality care" statements

were purportedly misleading because Defendants failed to disclose that they were (1) understaffing facilities, and (2) had patient incidents. *See, e.g.*, Compl. ¶¶ 129, 148, 157. But both were disclosed.

1. *Staffing Levels and Costs*. Acadia disclosed its employee numbers and staffing costs in detail throughout the proposed class period. *See, e.g.*, Ex. 6 (2013 10-K) at 12, 29 (disclosure of number of staff, staffing costs (Salaries, Wages & Benefits ("SWB"))[10], and same-facility staffing costs); *accord* Ex. 3 (2014 10-K) at 19, 44-45; Ex. 2 (2015 10-K) at 18, 49; Ex. 7 (2016 10-K) at 18, 49-50; Ex. 8 (2017 10-K) at 18, 47; Ex. 1 (2018 10-K) at 18, 49-50. Investors accordingly knew exactly how many employees Acadia had throughout the alleged class period, the amount Acadia was spending on the salaries, wages, and benefits for its employees, and the amount of same-facility year over year comparisons of staffing costs, so there can be no contention that the "quality care" statements were misleading for allegedly failing to disclose staffing costs.

Moreover, the disclosed employee numbers and staffing costs demonstrate that Acadia was ***not*** "rapidly cutting staff" or "slashing" staffing costs. To the contrary, year over year, the number of employees and same-facility SWB expenses increased or stayed the same, meaning that per-facility Acadia was regularly increasing staffing:

|      | Employees as of 12/31 | Total SWB | Same-facility SWB |
|------|-----------------------|-----------|-------------------|
| 2014 | 15,500 (11,200 full time) | $575.4 million | $412.8 million |
| 2015 | 26,400 (17,800 full time) | $973.7 million | $554 million (vs $524.4 million in 2014) |
| 2016 | 40,400 (26,900 full time) | $1.5 billion | $895.0 million (vs $830 million in 2015) |
| 2017 | 40,600 (27,500 full time) | $1.5 billion | $1.3 billion (vs $1.3 billion in 2016) |
| 2018 | 42,100 (28,600 full time) | $1.7 billion | $1.5 billion (vs $1.4 billion in 2017) |

There is no allegation that these disclosed staffing costs are inaccurate in any respect, and they flatly belie Plaintiffs' allegations. Thus, the purported failure to disclose staffing costs, which were

---

[10] Salaries, Wages and Benefits are the amount paid to staff and, thus, represent staffing costs incurred.

disclosed, does not make the "quality care" statements misleading.

2. *Patient Incidents*. Defendants likewise disclosed that Acadia had patient incidents. Indeed, Plaintiffs even misleadingly quote a section of Joey Jacobs's statement in an effort to hide this fact. In Paragraph 120, the Complaint cites Mr. Jacobs's quote, but leaves off the following part where he discloses the fact of patient incidents: "Now, that's not going to keep us from having incidents. . . . So when you are dealing with that kind of volume, you're going to have some incidents, some mistakes are to be made." *See* Ex. 10 (9/9/15 Conference Call Transcript).

Acadia also disclosed in its SEC filings throughout the alleged class period that its facilities have patient incidents:

> ***An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our securities***. Because the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, assaults and elopements, occur from time to time. If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us. Any such patient incident or adverse regulatory action could result in a governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations. In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our securities or adversely impact our reputation and how our referral sources and payors view us. Ex. 3 (2014 10-K) at 24 (emphasis in original).
>
> ***We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively***. … Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision. . . . [I]ndividuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public. Ex. 2 (2015 10-K) at 27 (emphasis in original).

*See also* Ex. 7 (2016 10-K) at 27; Ex. 8 (2017 10-K) at 27; Ex. 1 (2018 10-K) at 28.

Plaintiffs' allegation that the "quality care" statements were misleading for a failure to disclose patient incidents cannot stand because the documents incorporated into the Complaint by reference establish that the fact of patient incidents was disclosed.

### C.     The Substantial Regulatory Compliance Opinion Is Not Actionable.

The third statement that Plaintiffs allege to have been misleading is the statement that "[m]anagement believes we are in substantial compliance with all applicable laws and regulations and is not aware of any material pending or threatened investigations involving allegations of wrongdoing." Compl. ¶ 46. This is a statement of opinion. *See Omnicare*, 135 S. Ct. at 1327 (2015) (finding that the substantially identical statement "[w]e believe our contract arrangements with other healthcare providers, our pharmaceutical suppliers and our pharmacy practices are in compliance with applicable federal and state laws" was a statement of opinion).

For statements of opinion to be actionable in the Sixth Circuit, the Complaint must "allege particular facts demonstrating that defendants had actual knowledge that their statements concerning soft information were false or misleading at the time they were made." *Omnicare*, 769 F.3d at 471.[11] The Complaint's attempt to meet this very high standard fails. The Complaint alleges only that Acadia had "knowledge" of instances in which individual Acadia facilities had been found to be in violation of applicable laws and regulations (*see* Compl. ¶ 149) and of issues and

---

[11] In a separate *Omnicare* case, the Supreme Court addressed the requirements for successfully pleading that an opinion statement is false or misleading in violation of the Securities Act of 1933. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326 n.2 & 1327 (2015). Unlike the Exchange Act at issue here, the Securities Act does not require Plaintiff to plead scienter, such that the standard for pleading an actionable opinion differs (*i.e.*, if a speaker actually held the belief professed, the opinion could not be actionable under the Exchange Act). But even if the *Omnicare* standard applies to Exchange Act claims, the Complaint pleads no actionable opinion because it does not plead facts to establish that the individuals offering the opinions did not hold those beliefs or "lacked the basis for making those statements that a reasonable investor would expect." *Id.* at 1332.

conditions alleged in the October 2018 short seller report.

But knowledge of investigations at some of its hundreds of facilities does not render the opinion that Acadia—as a whole—was in substantial compliance false or misleading. *See In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 635 (S.D. Tex. 2018) ("A reasonable investor would understand the use of 'hedges and disclaimers,' such as the phrase 'substantial compliance,' and would not reasonably infer that [the company] had fully complied with every regulation or requirement.").

There can be no contention that Defendants were hiding the fact that some of Acadia's facilities had investigations when Acadia regularly disclosed: "We have been and could become the subject of governmental investigations, regulatory actions and whistleblower lawsuits." *See, e.g.*, Ex. 6 (2013 10-K) at 17.

And there is nothing in the Complaint to suggest that prior or potential future government investigations were material to Acadia as a whole. Indeed, if the investigations had been material, it would have manifested in Acadia's results. As Acadia disclosed: "Providers that are found to have violated any of these laws and regulations may be excluded from participating in government healthcare programs, subjected to loss or limitation of licenses to operate, subjected to significant fines or penalties and/or required to repay amounts received from the government for previously billed patient services." *Id*. In other words, revenues would have suffered if there were any material investigations. Throughout the alleged class period, however, Acadia's same-facility revenues increased year over year. *See* Ex. 1 (2018 10-K) at 49 (same-facility revenue growth of 5.2% in 2018); Ex. 8 (2017 10-K) at 47 (5.5% in 2017); Ex. 7 (2016 10-K) at 49 (7.6% in 2016); Ex. 2 (2015 10-K) at 49 (7.8% in 2015); Ex. 3 (2014 10-K) at 44 (10.8% in 2014).

The opinion statement of substantial compliance should be dismissed from the Complaint

because there are no allegations that Defendants had actual knowledge of its falsity.

## II. THE COMPLAINT FAILS TO ALLEGE A STRONG INFERENCE OF SCIENTER.

Even if Plaintiffs had identified an actionable misstatement, which they have not, the Complaint is still subject to dismissal for the separate and independent reason that it fails to plead the requisite strong inference of scienter. The PSLRA provides that "the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In the Sixth Circuit, that state of mind is a "knowing and deliberate intent to manipulate, deceive, or defraud, [or] recklessness." *Ley*, 543 F.3d at 809.

In *Tellabs*, the Supreme Court set forth the proper test for determining whether a strong inference of scienter has been pled. 551 U.S. 308. "To qualify as 'strong' . . ., an inference of scienter must be more than merely plausible or reasonable – ***it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent***." *Id.* at 309 (emphasis added). The test thus requires the Court to perform a comparative analysis, considering "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* at 314. Any "omissions and ambiguities [in the plaintiffs' allegations] count against inferring scienter." *Id*. at 326. Here, the Complaint cites to five purported facts as giving rise to an inference of scienter, but, as explained below, each factor is subject to competing inferences of nonfraudulent intent that are more compelling than the inferences of scienter that Plaintiffs urge. The Complaint, thus, fails to allege an inference of scienter that is more compelling than the innocent inference.

### A. Stock Sales.

Plaintiffs allege that sales of stock by the Individual Defendants give rise to an inference of scienter. But trading by company officers only "give[s] rise to an inference of scienter if the

trading is 'suspicious.'" *Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 820–22 (E.D. Ky. 2008) (citations omitted). "Plaintiffs have the burden at the pleading stage of explaining why the stock sales were unusual or suspicious. The mere sale of stock is not enough to lead the Court to infer scienter." *Grillo*, 553 F. Supp. 2d at 821. The Complaint fails to plead that the sales of stock were suspicious for at least three reasons.

*First*, courts have held that large amounts of stock sales over a lengthy alleged class period are generally not indicative of scienter. *See*, *e.g.*, *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007) ("Alleging such a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades"); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 897 (W.D. Tex. 2008) (citing lengthy class period in finding "timing of the Individual Defendants' trades fails to enhance any inference of scienter"). Here, the proposed class period extends more than four years. The allegation that executives, who are compensated mostly in the form of stock, sold stock over such a long period hardly gives rise to an inference of fraud.

*Second*, the amounts of the sales are not suspicious. The Complaint misleadingly compares the pre-class period trading with alleged class period trading to suggest that the amounts traded during the class period were suspicious. But because Acadia did not start trading until November 1, 2011, the pre-class trading period was less than two and a half years as opposed to the more than four year class period. When more appropriately broken down into two-year tranches, the Individual Defendants' trading was not unusual or suspicious:

|  | 2012-2013 (pre-class period) | 2014-2015 | 2016-2017 |
|---|---|---|---|
| **Joey Jacobs** | 323,893 | 297,967 | 500,000 |
| **Brent Turner** | 99,833 | 88,293 | 206,252 |

| | | | |
|---|---|---|---|
| **David Duckworth** | 4,000 | 55,073 | 16,670[12] |

For Messrs. Jacobs and Turner, the sales in 2014-2015, during the alleged class period, were similar in amount to the sales in 2012-2013 when no fraud is alleged to have occurred. "[A]ny inference of insider trading is negated by [the Individual Defendants'] trading [of Acadia stock] consistent in timing and amount with a past pattern of sales." *Stavroff v. Meyo*, 987 F. Supp. 987, 1000 (N.D. Ohio 1995), aff'd, 129 F.3d 1265 (6th Cir. 1997); *see also In re Keithley Instruments, Inc. Sec. Litig.*, 268 F. Supp. 2d 887, 902-03 (N.D. Ohio 2002) (rejecting stock sales as inferring scienter where class period sales were consistent with prior sales).

As to 2016-2017, the sale is larger than in prior years, but it was only one sale on August 22, 2017 for both Messrs. Jacobs and Turner, and the sale was in connection with a public secondary offering that Acadia announced on August 16, 2017. *See* Ex. 11 (8/18/17 Prospectus). Sales in an offering are not unusual. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 368-69 (5th Cir. 2004); *In re AFC Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004) (holding that "it is not uncommon or otherwise suspicious to sell stock in associate with a public offering; indeed, the sale of stock is often the point of the offering").

As Mr. Jacobs explained on an investor call:

> And then, we get a call. The company does, from Bain and Waud, saying we would like to do a registered offering. Senior management has a right to participate in that. It had been two years since I had sold any shares, and we had done it through a registered offering. So, it was a good time for me to do some estate planning for my family, and I think some of the members of senior management did also – did some estate planning, and that's the story, that's how it happened. If they hadn't called, we may not have sold. I am diversifying. I have two sons, and both of them have trust that I set up for them. And so, we were working on this estate planning, so that's the story.

Ex. 12 (9/6/17 Baird Transcript).

---

[12] *See* Composite Exs. 13, 14, and 15 (Form 4s reflecting trading activity).

Moreover, Messrs. Jacobs and Turner each agreed to sell a certain number of shares at $50.69 per share, which notably was more than $30 less per share than the stock's highest trading price during the putative class period. Ex. 11 (8/18/17 Prospectus); Compl. pp. 77-78. Selling the largest amount of stock when the price is low hardly suggests fraud. *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001); *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007). In short, the sales by Messrs. Jacobs and Turner are not suspicious and are not indicative of fraud.

As to Mr. Duckworth, the Complaint acknowledges that his largest sale of shares was in August 2015. Compl. ¶ 203. Mr. Duckworth had committed to selling a certain number of shares as part of a follow-on offering in August 2015. *See* Ex. 16 (Prospectus to Registration Statement No. 333-196611 dated June 9, 2014). Thus, this sale was not suspicious. *Southland*, 365 F.3d at 368-69; *AFC Enterprises*, 348 F. Supp. 2d at 1373.[13]

***Third***, the timing of the Individual Defendants' voluntary trading refutes any inference of scienter. *See Grillo*, 553 F. Supp. 2d at 822. "The longer the time between stock sales and the disclosure of bad news, the more scienter is negated." *Id.* The last stock sale made by the Individual Defendants that were ***not part of public offerings*** were as follows: April 12, 2015 for Mr. Jacobs, August 6, 2015 for Mr. Turner, and August 15, 2016 for Mr. Duckworth. This means that the sales were made more than two years before the first alleged corrective disclosure for Messrs. Jacobs and Turner and more than a year before the first alleged corrective disclosure for Mr. Duckworth. This timing is simply not indicative of fraud. *See Grillo*, 553 F. Supp. 2d at 822.

---

[13] The Complaint also alleges that stock sales by Acadia Chairman Reeve Waud's investment fund are somehow indicative of scienter. But most of those sales were in secondary offerings and, thus, are not indicative of scienter. *See Southland*, 365 F.3d at 368-69; *AFC Enterprises*, 348 F. Supp. 2d at 1373. Moreover, sales by insiders other than named defendants are irrelevant and contribute little, if anything, towards the creation of a strong inference. *See Campbell v. Lexmark Int'l Inc.*, 234 F. Supp. 2d 680, 685 (E.D. Ky. 2002).

### B.      Defendants' Monitoring of Quality Control Metrics.

The Complaint next regurgitates Acadia's disclosures on the monitoring of control quality metrics as somehow indicative of scienter. Compl. at ¶¶ 211-17. But monitoring quality metrics is something that every business does, and, in any event, the Complaint does not allege a single fact that the monitoring purportedly revealed to Defendants that demonstrated knowledge of false statements. Rather, Plaintiffs assert the strained inference that the monitoring must have alerted Defendants to the issues alleged in the October 2018 short-seller report. As a threshold matter, "short sellers operate by speculating that the price of a security will decrease . . . [so] they have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *In re Longtop*, 910 F. Supp. 2d at 577. Thus, the allegations in the October 2018 short-seller report should not be given any credence.

Moreover, even if the monitoring did reveal to Defendants the allegations in the short report, those allegations do not make Defendants' statements untrue. As explained *supra* at Section I(B), Defendants disclosed throughout the alleged class period Acadia's staffing costs and the fact that Acadia's facilities have patient incidents and government investigations. In the absence of allegations that Defendants learned of any particular facts from the monitoring that made them aware that their statements were false or misleading, the allegations regarding quality control monitoring do not give rise to any inference of scienter (let alone a compelling one).

### C.      The Incentive Compensation System.

Plaintiffs next allege that Acadia's "compensation structures . . . incentivized employees and executives to prioritize short-term profits above patient care." Compl. ¶ 219. In making this allegation, Plaintiffs rely on statements from purported former Acadia employees. *Id.* ¶¶ 220-221. It is widely recognized that any inferences drawn from uncorroborated statements from confidential witnesses, particularly former employees who are identified only by title, "must be

steeply discounted." *Omnicare, Inc.*, 583 F.3d at 946.

Additionally, neither the uncorroborated statements of the unnamed former employees nor the allegations in the Complaint support the notion that a focus on earnings was to the detriment of patient care. Indeed, as Acadia disclosed, poor patient care can lead to investigations that, in turn, cause facilities to "be excluded from participating in government healthcare programs, subjected to loss or limitation of licenses to operate, subjected to significant fines or penalties and/or required to repay amounts received from the government for previously billed patient services." Ex. 6 (2013 10-K) at 8. In other words, Acadia had to take care of its patients to be profitable. So, an incentive compensation system tied to financial metrics actually focuses on patient care and does not exclude it, as Plaintiffs contend. In short, Plaintiffs have failed to demonstrate that Acadia's incentive compensation structure results in decreased quality of care giving rise to scienter. The much more compelling explanation for the compensation structure is that it is intended to encourage quality care because good care is seen in the financial results.[14]

### D. Corporate Turnover.

Plaintiffs allege that the replacement of Mr. Jacobs as Acadia's CEO and Chairman of the Board in December 2018 and the subsequent departure of Mr. Turner as Acadia's President in March 2019 somehow indicates scienter. But, despite Plaintiffs' theatrical depiction of these leadership changes as a "bloodletting," there was nothing nefarious about either executive change. This is not a case of a corporate meltdown that resulted in executive terminations, as can be seen by Acadia's revenue increases throughout the proposed class period.

---

[14] Moreover, as discussed in Acadia's public filings, the "pay-for-performance philosophy" of Acadia's executive compensation system "works to align the interests of management with the interests of stockholders." Ex. 19 (DEF14A) at 26. And, Acadia's Compensation Committee uses an independent compensation consultant to advise on market trends and practices and specific compensation decisions. *Id.* at 27.

In the case of Mr. Jacobs, the board of Acadia simply determined it was time to replace him with someone new. Prior to the leadership change, Mr. Jacobs had been CEO of Acadia for seven years during which time Acadia saw revenue growth from $216 million in 2011 to over $3 billion in 2018. *See* Ex. 6 (2013 10-K) at 26; Ex. 1 (2018 10-K) at 44. Acadia explained in a release announcing the transition: "As the Board looked to accelerate Acadia's momentum and drive value creation, we felt that now is the right time to bring in a new leader." Ex. 17 (12/16/18 8-K).

As to Mr. Turner, Acadia reported that he was "leaving the Company by mutual agreement" and that his "departure was not a result of any disagreement with the Company relating to the operations, financial reporting, accounting practices or policies of the Company." Ex. 18, (3/25/19 8-K). Mr. Turner had been with Acadia for more than eight years at the time of his departure and, like Mr. Jacobs, had helped Acadia achieve significant growth during that time.

Additionally, the timing of these leadership changes does not support Plaintiffs' implication that they were due to any sort of nefarious behavior by either of the executives. The first alleged corrective disclosure occurred in October 2017, more than a year prior to the replacement of Mr. Jacobs and almost a year and a half prior to the departure of Mr. Turner. These innocuous executive changes that occurred long after Acadia's revision of its 2017 earnings guidance fail to give rise to a strong inference of scienter. *In re The Great Atlantic & Pacific Tea Co. Sec. Litig.*, 103 F. App'x 465, 470 (3d Cir. 2004) (terminations and resignations not indicative of scienter); *In re Interpool, Inc. Sec. Litig.*, No. 04-321, 2005 WL 2000237, *17 (D.N.J. Aug. 17, 2005) ("resignations of key officers [] insufficient to show that they acted with requisite scienter").

### E. The Sustainability Report.

Finally, the Complaint references a stockholder proposal for a sustainability report and implies that the Defendants' recommendation against the proposal is evidence of scienter. Compl.

¶ 229. Plaintiffs admit, however, that Acadia's Board set forth its actual reasons for recommending against the proposal in its public filings, which explained that the Board felt that the proposal was "unnecessary" and would "distract from core elements of [Acadia's] business strategy," as detailed in the proxy statements. Compl. ¶ 228.

The recommendation against the proposal was a judgment call, which amounts to a matter of opinion. *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011); *City of Dearborn Heights Act 345 Police & Ret. Sys. v. Align Tech. Inc.*, 856 F.3d 605, 617 (9th Cir. 2017); *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1008 (N.D. Cal. 2016). And, as discussed above, when an allegation is based on an opinion, the plaintiff must allege that the maker of the statement did not hold the belief it professed. *Omnicare*, 769 F.3d at 471. Here, Plaintiffs have not alleged that the Board ***did not*** believe the sustainability report was unnecessary or that it would distract from Acadia's business strategy. They have thus failed to show that the Board's discretion in recommending against the proposal infers scienter.

Additionally, both the shareholder proposal and Acadia's recommendation were disclosed to shareholders. *See* Ex. 19 (4/13/17 Proxy Statement). Armed with the full details of the proposal and Acadia's reasons for recommending against it, and knowing that Acadia had patient incidents, regulatory investigations, and exactly what its staffing costs were, Acadia shareholders overwhelmingly voted against the proposal. *See* Ex. 19 ("73.4% of outstanding shares entitled to vote at the meeting cast their ballots against this proposal or abstained from voting"). Recommending against a proposal that the shareholders themselves overwhelmingly rejected cannot support an inference of scienter.

Moreover, the Complaint fails to acknowledge that, even though the Board initially

recommended against the proposal, Acadia did, in fact, ultimately conduct a sustainability report, the results of which were reported on Acadia's website and which showed high levels of satisfaction among Acadia's patients: 94.5% of patients reporting feeling improvement in hopefulness over the last 12 months in Acadia's care, 70.1% gave high ratings to the counseling and treatment they received from Acadia, and 84% reported that they were likely to recommend treatment at an Acadia facility.[15] Simply put: nothing about the proposal for a sustainability report, or the Board's reactions thereto, supports an inference of scienter.

For all of these reasons, Plaintiffs have not alleged facts giving rise to a strong inference of scienter, which independently requires dismissal of the Section 10(b) claim.

## III. PLAINTIFFS' SECTION 20(a) CLAIMS SHOULD BE DISMISSED.

Because the Complaint fails to state a claim for primary liability under Section 10(b), there can be no claim for "controlling person" liability under Section 20(a) and such claim must also be dismissed. 15 U.S.C. § 78t(a); *see also Ley*, 543 F.3d at 818.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Motion to Dismiss be granted and that Plaintiffs' Complaint be dismissed with prejudice.

This 31st day of May, 2019.

*/s/ Steven A. Riley*
Steven A. Riley (BPR # 006258)
Milton S. McGee, III (BPR # 024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 320-3700
sriley@rwjplc.com
tmcgee@rwjplc.com

---

[15] *See* "Caring About Our Patients," Acadia Healthcare website, https://www.acadiahealthcare.com/about/social-responsibility/patients, last visited May 9, 2019.

25

Jessica P. Corley (*pro hac vice*)
Lisa R. Bugni (*pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street N.E.
Atlanta, GA 30309
(404) 572-4600
jcorley@kslaw.com
lbugni@kslaw.com

*Counsel for Defendants*

26

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of May, 2019, I electronically filed the following document and accompanying exhibits with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Christopher M. Wood
Jerry E. Martin
ROBBINS GELLER RUDMAN &
DOWD LLP
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2203
cwood@rgrdlaw.com
jmartin@barrettjohnston.com

Danielle S. Myers
David C. Walton
ROBBINS GELLER RUDMAN &
DOWD LLP
655 W Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
danim@rgrdlaw.com
davew@csgrr.com

Thomas C. Michaud
VANOVERBEKE, MICHAUD & TIMMONY, P.C.
79 Alfred Street
Detroit, MI 48201
(313) 578-1200
tmichaud@vmtlaw.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN & GARRISON, LLC
Bank of America Plaza
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2202
Fax: (615) 252-3798
jmartin@barrettjohnston.com

1

Matthew M. Guiney
Patrick Donovan
Regina M. Calcaterra
Thomas H. Burt
WOLF, HALDENSTEIN, ADLER, FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
(212) 545-4600
guiney@whafh.com
donovan@whafh.com
calcaterra@whafh.com
burt@whafh.com

Paul Kent Bramlett
BRAMLETT LAW OFFICES
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: pknashlaw@aol.com

_/s/ Steven A. Riley_____

2